## Robert John Speck *et al.*

*v.*

## The Pullman Palace Car Company *et al.*

*Filed at Springfield May 12, 1887.*

| | |
|---|---|
| 121 | 33 |
| 144 | 247 |
| 121 | 33 |
| 148 | 26 |
| 148 | 220 |
| 121 | 33, |
| 44a | 492 |
| 121 | 33 |
| 160 | 574 |
| 51a | 429 |
| 121 | 33 |
| 64a | 568 |
| 121 | 33 |
| 174 | 278 |
| 121 | 33 |
| 96a | ²425 |
| 121 | 33 |
| 199 | ⁶ 42 |

1. ABATEMENT—*death of a complainant in partition—after decree of sale.* After a decree of partition and for the sale of the lands, and before the sale, two of the complainants in the bill died, leaving the remaining complainants their only heirs-at-law: *Held,* that the proceeding did not abate by the death of part of the complainants, but survived to their co-complainants, and that their death did not render a subsequent sale of the premises without an order of revivor, invalid.

2. TENANTS IN COMMON—*lien created by one of them—affecting his interest only—before and after partition.* A deed of trust given by one tenant in common upon the property, is binding only on the interest of the party making the same, and after a decree of sale in a proceeding for partition, will follow his interest, only, in the proceeds. Such an incumbrance will in nowise adversely affect the interests of the other tenants in the premises, or their interests in the proceeds of the sale.

3. JUDICIAL SALE—*order confirming sale in partition—its conclusiveness.* A sale under a decree in a suit for partition is a judicial sale, and an order confirming the same is conclusive as to all matters upon which the court might have been called upon to pass, had the parties brought them forward as objections to the confirmation, especially when the parties had knowledge, or might reasonably have had knowledge, of the facts upon which to base them.

4. LACHES—*in filing bill to set aside sale.* A decree confirming a partition sale was made on April 13, 1880, and a party in interest, who resided in the vicinity of the property, soon after accepted the money due him, on the basis of that decree, stood by and witnessed the expenditure by the purchaser of over a half a million of dollars in improving the property, and made no complaint of the sale until August 13, 1883, when he filed his bill to set the sale aside: *Held,* that if such party ever had the right to set the sale aside, he was guilty of such *laches* as to bar his right to the relief sought.

5. ASSIGNMENT *after maturity—not fraudulent—subject to what defences.* The assignment of a promissory note after maturity, being subject to all defences against the payee, can in no manner injure or prejudice the rights of the maker, and is therefore not fraudulent as to him.

6. PARTIES—*suit in the name of an insane person.* Under our statute, a suit for the partition of land may be prosecuted in the name of a lunatic or

insane person, he having no conservator appointed. A judgment at law is neither void nor voidable because the plaintiff is an insane person.

7. PRESUMPTION—*as to motive of a party.* Where two motives for an act done, the one lawful and the other unlawful, are presented, it must be assumed, in the absence of satisfactory evidence to the contrary, that the lawful·motive controlled.

APPEAL from the Superior Court of Cook county; the Hon. GWYNN GARNETT, Judge, presiding.

One Charles Dunn died intestate, in Cook county, in 1869, seized in fee of the premises in controversy. He left a widow, Bridget Dunn, but no child or children, or descendants of child or children, surviving him. His next of kin, under our statute, were his brothers, George Dunn, James Dunn and Robert C. Dunn, and his nephew, Robert John Speck, the son and only child of his sister, Ellen Speck. The widow, Bridget, subsequently intermarried with Patrick Connelly. George Dunn, James Dunn and Robert John Speck resided in England. The other parties in interest resided in Cook county, in this State. On the 24th of August, 1873, Robert C. Dunn, George Dunn and James Dunn, and Robert John Speck, filed their bill for partition of the premises in controversy, in the Superior Court of Cook county, against the said Bridget and Patrick Connelly, and summons was served upon them. Afterwards, and on or about the 11th of September, A. D. 1873, Bridget employed Kretzinger & Johnson, a firm of attorneys-at-law, composed of George W. Kretzinger and William S. Johnson, to make defence for her, representing to them, as is testified by one of them, "that she had witnesses to prove it was her money that the property was purchased with; that she could prove that Dunn, her former husband, had received this money from her, with the agreement, on his part, to buy the land and take the deed in her name, and that he reported to her he had done so, or that she understood it was so done, and that she did not know to the contrary until after his

death," and that she could prove this by witnesses other than herself, and it was thereupon agreed, as claimed by them, though it is denied by her, that she was to pay them, for their services, etc., in defending the suit, $6000, for which the note of herself and husband, payable one year after date, was then given to them, and secured by trust deed on the property in controversy, to one Paul Cornell. Shortly after the execution of this note and trust deed, John I. Bennett became a partner of Kretzinger & Johnson, and that firm filed an answer for Bridget Connelly, and also a cross-bill to the bill for partition, setting up the claim made by her in respect of the purchase of the premises in controversy, and claiming a resulting trust in her favor. The Superior Court, on hearing, decreed that the cross-bill of Bridget Connelly be dismissed, and that partition of the premises be made in accordance with the rights of the parties, as set up in the bill, and appointed commissioners to make partition. The commissioners reported that the premises were not susceptible of division, and appraised their value. The court thereafter, on the 4th of August, 1874, decreed that they be sold by special commissioner. The defendants, Bridget and Patrick Connelly, appealed to this court. Meanwhile, the firm of Bennett, Kretzinger & Johnson had dissolved, and John I. Bennett had become sole owner of the promissory note and mortgage executed by the defendants, as aforesaid. The firm of Bennett, Kretzinger & Veeder, of which John I. Bennett was a member, appeared in this court and represented Bridget and Patrick Connelly, on their appeal, and argued the case on their behalf; and this court, at its September term, A. D. 1874, rendered judgment affirming the decree of the Superior Court, upon the ground that Bridget Connelly had no witness but herself to prove the allegations relied upon to establish a resulting trust, and that she was incompetent to testify, as a witness, to those facts. See *Connelly et al.* v. *Dunn et al.* 73 Ill. 218.

L. W. Pence, who was appointed commissioner to make the sale, did not advertise the premises to be sold until late in 1879, when he advertised that they would be sold on the 10th day of December, A. D. 1879. At that time the commissioner offered the premises for sale, and there was bid only the sum of $125 per acre, which, being less than two-thirds of the appraised value, ($250 per acre,) there was no sale; and the commissioner subsequently reported this fact to the court. On the 20th of January, 1880, the Superior Court approved the report, and the court thereupon further decreed, that "this cause being further heard on said report, and the further evidence adduced before the court that said premises will not sell for two-thirds of the amount thereof, as set forth in the decree of sale, and the commissioner's report therein mentioned and included in this cause heretofore entered, and the court being fully advised in the premises, upon motion of defendants' solicitors it is hereby ordered, adjudged and decreed that the following other named commissioners be and they are hereby appointed to re-value said premises,— that is to say," (naming the commissioners) "who shall take the usual oath, etc., and make report to the court." The commissioners thus appointed, reported to the court on the 3d of February, 1880, that they had re-valued the premises, and appraised the same at $110 per acre. This report was approved by the court on the same day; and the court then further decreed that Le Grand Pence execute the decree of sale, and that he permit purchasers at the sale, at their option, to pay cash, instead of executing promissory notes, for the purchase money. Pence advertised the premises for sale on the 6th of March, 1880, and on that day he sold them at public vendue to Luther H. Pierce, for $22,100, who, exercising his option under the decree of the 2d of February, 1880, then paid the amount. The commissioner reported the sale to the court, and Bridget and Patrick Connelly appeared and filed the following objections to the sale, to-wit:

"*First*—Said premises were sold for a grossly inadequate sum of money compared with the fair and reasonable market value thereof, and were sold for $10,000 less than the same were reasonably worth.

"*Second*—That the same was hurried through, and was not kept open for competition or other bidders.

"*Third*—The commissioner announced that said premises would be sold clear of all taxes; that he was unauthorized by said decree of sale to make any such announcement or condition.

"*Fourth*—Said commissioner demanded a deposit, on the spot, of $1500, which he was unauthorized to demand, and had no right to require such an amount.

"*Fifth*—A substantial bidder has offered to purchase said premises, and pay therefor $5400 more than the same were sold for on March 6, 1880, and said bidder stands ready to pay into court a reasonable sum to make good said bid in case of a re-sale of said premises.

"*Sixth*—That said commissioner announced at said sale, and so made it a part of the terms of said sale, that all taxes, liens and deeds on account of taxes accruing since 1869 should be removed and canceled out of the proceeds of said sale.

"*Seventh*—That sufficient publicity was not given of the pendency of sale prior to the making thereof. Offer to raise the amount of the bid."

The offer of E. S. Alexander to pay $27,100 for the premises,—one-third cash at the time of sale, one-third in one year, and one-third in two years, the deferred payments to bear interest at eight per cent per annum, and be secured by mortgage on the premises,—upon condition that the title was good, and also numerous affidavits upon the question of the value of the premises, were read in support of the objections. The court, after considering the objections and the offer and affidavits, and listening to the arguments of counsel, overruled the objections, and confirmed the report of the commissioners,

and ordered that deed be executed to Pierce; and afterward, on the 13th of April, A. D. 1880, pursuant to agreement of all the parties, the court further decreed as follows:

"Complainants, by their solicitors, now move the court for a distribution of the purchase money now in the hands of said commissioner, and said defendants, Bridget and Patrick Connelly, being personally present in court, as well as by their solicitors, F. W. Young and J. K. Hannay, and said purchaser being also present, and the court having heard evidence and being fully advised in the premises, doth find that said Bridget Connelly has occupied said premises, as her homestead, ever since the death of Charles Dunn, her former husband, which occurred in October, 1869, and has received the issues, rents and profits thereof; that since and including the year 1874, no taxes have been paid by said Bridget Connelly upon said premises; that it was her duty to have paid the same, and she is chargeable with payment thereof, and that the same be applied upon the amount due her upon her dower, and after charging her with the proportionate amount thereof, the court finds the balance due her upon her dower, to be the sum of $1000, which is to be paid to her by said commissioner, out of the fund belonging to said complainants, in full of all demands of said Bridget Connelly on account of her dower, which she now consents to and accepts. The court finds that Rosenthal & Pence have paid for abstracts, $235, and orders the same to be paid out of the proceeds. The court being advised, orders that the special commissioner retain his commissions, etc., and pay all the costs, and pay Rosenthal & Pence $235 on account of the abstracts of title so ordered and paid for by them; that he pay to Pierce $1200, the amount allowed him for taxes and tax titles as above, which shall be in full of all claims by him, or of any person claiming under him, to any portion of said purchase money or fund; that the commissioner shall then divide what shall remain in his hands, into two equal parts: one of those parts

he shall then pay over to Bridget Connelly, or her solicitor, which shall be in full of her claim as heir-at-law of Charles Dunn, deceased, in and to said premises, and out of the other part of said fund he shall pay Bridget Connelly the sum of $1000, which shall be in full of her dower upon said fund, and what shall then remain he shall then pay over to said complainants, their representatives or solicitors, Rosenthal & Pence, one-fourth part thereof, the whole of the balance of said fund so remaining in his hands belonging to said complainants or their legal representatives. Said complainants and defendants, Bridget and Patrick Connelly, in open court, waive and release all errors in this cause, and agree that no writ of error or appeal shall be prosecuted or any bill in equity filed to interfere in any manner with the operation of this decree, and they release all errors which may have intervened in entering up this decree or any decree or order in this cause."

Pierce subsequently conveyed the premises to George M. Pullman. Pullman conveyed to David B. Lyman and H. W. J. Jackson, trustees of the Pullman Land Association, and they conveyed to the Pullman Palace Car Company. Bennett sold and transferred the note and mortgage executed by the Connellys to Kretzinger & Johnson, to Bowen, for $7000. Pierce, in buying the premises, and Bowen, in obtaining the note and mortgage, were, in fact, acting as agents for George M. Pullman.

The Connellys employed Young & Hannay to represent their interests, some time in January, A. D. 1880; and after this employment, (between January 20 and February 11,) Hannay, of that firm, representing the Connellys, called upon Rosenthal & Pence, the attorneys representing the complainants in the partition suit, and endeavored to obtain their consent to not have a sale of the premises, and to divide them, setting off the share of Bridget Connelly to her so that she could reside upon it; but they refused to consent either to a division of the property or to a postponement of the sale.

On the 17th of February, 1880, Young & Hannay, on behalf of the Connellys, moved the Superior Court for leave to file a bill of review in the partition case. The grounds upon which the proceeding was sought to be reviewed are not disclosed by the abstract. Rosenthal & Pence, the attorneys for the Dunns and Speck, appeared, and resisted the motion; but the court sustained the motion, and allowed the bill to be filed. At the same time, the attorneys of the Connellys moved for an injunction to stay the sale, etc., in the partition case. This was also resisted by Messrs. Rosenthal & Pence, attorneys for the complainants, and the court refused to grant the injunction. On the same day, (February 17, 1880,) the Connellys, by their attorneys, Young & Hannay, also filed in the Superior Court of Cook county their bill in chancery, against Kretzinger, Johnson & Bennett, praying that the note and mortgage so executed by the Connellys to Kretzinger & Johnson be canceled. On the 13th of March, 1880, Ullman, as the attorney of Beach, notified the Connellys that they would enforce the trust deed against their interest in the proceeds of the sale; and thereupon, Beach was made a co-defendant with Kretzinger, Johnson & Bennett, to the bill of the Connellys. In this matter Beach was acting simply as the agent of George M. Pullman. The bill for review and the bill for the cancellation of the mortgage were dismissed after the decree was rendered on the 13th of April, A. D. 1880, and in consequence of the agreement then made.

Between July 1, 1880, and July 1, 1883, $677,491 was expended in improving this property. There are four solid blocks of cottages upon it, and also a large foundry and roundhouse, besides other improvements.

On the 17th day of May, 1880, John I. Bennett brought suit in the Superior Court of Cook county, against Bridget Connelly, for fees for services as an attorney-at-law in the partition case of *Dunn et al.* v. *Connelly.* She pleaded a set-off of the $7000, being the amount received by Bennett from

Bowen on account of the mortgage to Kretzinger & Johnson, and claimed judgment for the residue. Trial was had at the September term, 1880, of the Superior Court, resulting in a judgment of $5057.31 for Mrs. Connelly. That judgment was affirmed on appeal to the Appellate Court for the First District; but on appeal to this court, from that judgment, it was reversed, with directions to the Appellate Court to render judgment reversing the judgment of the Superior Court, and direct that court to award a trial *de novo.* (*Bennett* v. *Connelly*, 103 Ill. 50.) Afterwards, on the 21st of July, 1884, Bennett dismissed that suit. Bridget Connelly thereafter, on the 9th of December, 1884, brought suit in the Superior Court of Cook county, against John I. Bennett, to recover the said sum of $7000 so paid to him by Bowen, on the said mortgage, and that suit was still pending and undetermined when this cause was tried in the Superior Court.

On the 15th of July, 1883, Robert John Speck, and James Dunn, by his next friend, Simeon Straus, filed their bill in chancery in the Superior Court of Cook county, alleging therein the filing of the bill for partition before herein referred to, the allegations thereof, and the proceedings therein down to and including the decree of sale on the 4th of August, 1874. It is then alleged, "that Robert C. Dunn died intestate on October 19, 1874, leaving neither widow nor child, nor parent, him surviving, but leaving him surviving, the complainant, Robert J. Speck, James Dunn and George Dunn, his only heirs-at-law; that James Dunn and George Dunn are the brothers of deceased Robert C. Dunn, and that Robert J. Speck was the only child or descendant and heir-at-law of Ellen Speck, wife of William Speck, formerly Ellen Dunn, a sister of Robert C. Dunn, who had intermarried with said William Speck, the father of complainant, Robert J. Speck, and that said Ellen Speck died about the 17th day of February, 1852, leaving her surviving, her husband, William J., and said complainant, Robert J. Speck, her only heirs-at-law; that on

July 21, 1879, George Dunn died intestate, leaving him sur-
viving, no wife nor child, nor father nor mother, but left him
surviving, the complainant, Robert J. Speck, and James Dunn,
his only heirs-at-law." The execution of the note of $6000,
by Bridget and Patrick Connelly, to Kretzinger & Johnson,
and the securing of the same by deed of trust to Paul Cornell,
on the premises in controversy, is then alleged; the history
of the partnership of Bennett, Kretzinger & Johnson, and its
dissolution, and the assignment of the $6000 promissory note
to Bennett; and it is then charged, that the Pullman Palace
Car Company and George M. Pullman, being desirous of pur-
chasing said premises under the decree of the Superior Court
above referred to, on or about January 10, 1880, did, by their
agent, represent to John I. Bennett, who had been the attorney
of Bridget Connelly in said partition suit, that said premises
were not of the value, and could not be sold for, two-thirds
of the appraisement made in that case, and, by their agent,
then entered into an agreement with said John I. Bennett,
that if he would procure a re-appraisement of said premises,
under the order of the court, and to reduce the amount thereof,
and procure an immediate sale of said premises, they would
bid in and purchase said premises at a sale to be made by
the court, and would, in addition thereto, pay to him the
amount so secured by said trust deed; that a release thereof
should be executed by the trustee, Paul Cornell, and left with
said Bennett, which should be filed for record only after the
sale under said decree, and confirmation thereof, and said
corporation and said Pullman should make no claim upon
Bridget Connelly, or the lands involved, or the proceeds of
the sale, and that said bid and said release of said trust deed
should not affect the rights of said Bennett to receive and
collect his fees of said Bridget, and for advances and expenses
in such suit. It is then further charged, in substance, that
pursuant to that agreement, Bennett procured a re-appraise-
ment of the property at the sum of $110 per acre, an approval

thereof by the court, and a new order of sale; that on the 20th of January, 1880, the Pullman Palace Car Company and George M. Pullman paid Bennett, pursuant to the agreement, $7000, the amount due on the note and trust deed, etc., placed a release of the trust deed in the hands of Bennett, to be used as per the agreement; that Bennett caused the premises to be advertised for sale on the 6th of March, 1880; that they were then sold, and bid in by Luther H. Pierce, agent for the Pullman Palace Car Company, and George H. Pullman, for $22,100; that Bennett had no authority to act as attorney for Bridget Connelly after July 1, 1875; that objections were made to the confirmation of the sale by the attorneys for Bridget Connelly, other than Bennett, but that Pullman's Palace Car Company and Pullman insisted on the confirmation of the sale; that, to induce Bridget Connelly to withdraw her objections to the confirmation of said sale, they caused her to be notified that they would make application to the said court to have the amount due upon said note and trust deed paid out of her share of the proceeds of said sale, concealing from her that the note and trust deed had been released, and thereupon, she, being ignorant of the payment to Bennett, and of the release of the trust deed, consented to the confirmation of the sale, the cancellation of the $6000 note, etc.; that, prior to the confirmation of the sale, a *bona fide* offer was made to increase the amount for which the property was sold, $5000; that abundant evidence was produced to the court that said premises were, at the time of the sale, of the value of at least $30,000; that had the sale been set aside, and a re-sale ordered, the premises would have sold for at least $50,000; that it was not, at the time of the sale, known that the premises were purchased for said Pullman Palace Car Company, or said Pullman. It is alleged that complainants resided in England, and had no knowledge of the facts aforesaid; that the sale was finally approved, March 16, 1880, and deed executed accordingly. It is further al-

leged, that the Connelly trust deed was filed for record after the commencement of the partition suit, and formed no lien upon the premises of the complainants; that the same, in law, could not remain a lien upon the lands in the hands of the purchaser at the sale. It is also further alleged, that for some time prior to the first day of January, 1880, complainant James Dunn was an insane person, duly adjudicated to be such by a court of competent jurisdiction, and was, at the time of the proceedings subsequent to January 1, 1880, and ever since has been, insane, and has been in a hospital for the insane; that the Pullman Palace Car Company and George Pullman had notice of the death of said Robert C. Dunn and said George Dunn, and of the insanity of James Dunn, as before set out. It is further alleged, that the decree finding the interests of the complainant in the partition suit, and the decree of August 4, 1874, ordering a sale of the premises, have never been revived, nor have the deaths of George and Robert Dunn ever been suggested of record, etc. It is alleged, that the sale is null and void, but if any title is vested thereby, it was only the interest of the present complainants, as found by the court in its decree of partition of June 4, 1874,—namely, one-eighth part of the premises, subject to the dower therein of Bridget Connelly; that their interests as heirs-at-law of Robert C. and George Dunn have never been sold. Conveyances are alleged, by the commissioner to Luther H. Pierce, by Pierce and wife to George M. Pullman, by Pullman and wife to Lyman & Jackson, trustees of Pullman Land Association, and by Lyman & Jackson to Pullman Palace Car Company. Complainants offer to do equity, and to return to Pullman and Pullman Palace Car Company, or to whomsoever shall be entitled thereto, the proceeds of said sale. George M. Pullman, Pullman Palace Car Company, Luther H. Pierce, David B. Lyman, Huntington W. Jackson, and Bridget and Patrick Connelly are made defendants. The bill prays that a decree may be entered,

vacating and setting aside such sale and order of confirmation, and all orders made subsequent to January 1, 1880, and the deeds executed subsequent to the sale.

Bridget and Patrick Connelly answered, admitting all the allegations in the bill. They then filed a cross-bill repeating, in substance, the same allegations, and adding that they are very ignorant; that they can neither read nor write, except that Patrick can, with great difficulty, write his own name. They then allege, that on the 11th of September, 1873, George W. Kretzinger and William S. Johnson, by fraud, obtained their signatures to a promissory note for $6000, payable in one year from that date, with interest thereon at ten per cent per annum, payable annually, and their signatures to a trust deed, and their acknowledgment thereof, to Paul Cornell, trustee, on the premises in controversy, to secure the payment of this note. They allege they never intended to execute such note and trust deed, and that when they signed them, and acknowledged the trust deed, they did not know what they were doing, and that there was no consideration for their execution. The sale of the note and trust deed, by Bennett to Bowen, for $7000, is then repeated, as in the original bill, and that the $7000 was, in fact, a bribe paid to Bennett by Bowen to procure him to have a re-appraisement and sale of the property, contrary to the wishes and interests of the cross-complainants, and the prayer is the same as in the original bill.

Answers were filed by Luther H. Pierce, the Pullman Palace Car Company, George M. Pullman and Lyman & Jackson, putting in issue the material allegations of the bill and cross-bill. It was also set up that Pullman was a purchaser in good faith, without other notice of the condition of the title than that disclosed by the records, for full value, etc.; that he never authorized Bowen to make any conditions or terms in the purchase of the $10,000 note, and trust deed securing it, but simply empowered him to purchase it outright; that he

made no contract with Bennett, and authorized no one else to do so for him, to procure a re-valuation of the property and a sale thereunder; that Lyman & Jackson were purchasers from Pullman, in good faith, and without notice of any of the irregularities charged in regard to the sale; that the Pullman Palace Car Company was a like purchaser in good faith from Lyman & Jackson, without notice, etc.; that the complainants in the original and cross-bills were guilty of *laches*, in that they knew of all the matters now alleged against the sale in July, 1880, and yet afterwards stood by, and, without notice of their dissatisfaction with the sale, saw large sums of money invested upon the property, in buildings and other improvements, upon the faith of the title acquired at the sale.

The cause was heard on the 21st of June, 1886, and the court thereupon decreed that both the original and cross-bills be dismissed. From that decree this appeal is prosecuted, and errors are assigned presenting the questions considered in the opinion.

Messrs. Rosenthal & Pence, for the appellants:

A court of equity will set aside a judicial sale, and order a resale, if the purchaser is guilty of any fraud. *Comstock* v. *Purple,* 49 Ill. 158; *Coffey* v. *Coffey,* 16 id. 141; *Bethel* v. *Sharp,* 25 id. 173; *Lloyd* v. *Malone,* 23 id. 48; *Wilson* v. *Kellogg,* 77 id. 47; *Haas* v. *Building Society,* 111 id. 176.

By the death of a party after decree, a suit abates, and no title will pass until the proceedings are revived by making the necessary parties. Story's Eq. Pl. secs. 366, 369, 387; Lube's Eq. Pl. 192; *Brown* v. *Parker,* 15 Ill. 307; *Laflin* v. *Herrington,* 16 id. 301; *Clingman* v. *Hopkins,* 78 id. 152; *Welch* v. *Louis,* 31 id. 455; *Ice Co.* v. *Slee,* 2 Paige, 364.

Was Mrs. Connelly guilty of *laches* in bringing her suit? *Laches* can not be attributed to a party until he shall have knowledge of the facts upon which it is based. *Clapp* v. *Peterson,* 104 Ill. 26.

A party can not assert *laches* as a defence who has himself been guilty of the fraud upon which the action is based. Bigelow on Fraud, 446.

Mere delay, short of the Statute of Limitations, in not sufficient to bar a right. It is only where, by such delay, the adverse party is led into a course of conduct which he would not have otherwise pursued, that the defence of *laches* can be considered. *Gibbons* v. *Hoag,* 95 Ill. 69; *Hefner* v. *Vandolah,* 57 id. 520.

*Laches* can only be invoked when the party claiming has been guilty of such gross negligence as to amount to a constructive fraud. *Brant* v. *Coal Co.* 93 U. S. 326; *Henshaw* v. *Bissell,* 18 Wall. 255; Bigelow on Fraud, 440.

Lapse of time will be no bar against actual fraud on the part of the person invoking. Bigelow on Fraud, 446; *Hefner* v. *Vandolah,* 57 Ill. 520; *Preston* v. *Mann,* 25 Conn. 118.

It is essential in order that *laches* should be a bar, that the other side should be acting in ignorance of the real condition of his title, and in the supposition that he was rightful in his own dealing. 2 Pomeroy's Eq. Jur. sec. 818, note; Kerr on Fraud, (Am. ed.) 133, 138; *Rennie* v. *Young,* 2 DeG. & J. 136; *Kinney* v. *Brown,* 3 Ridg. 518; *McCormick* v. *McMurtie,* 4 Watts, 192.

Mere silence by the rightful claimant, and making of improvements by the other party, is not sufficient to constitute *laches.* There must be some ingredient in the transaction which would make it a fraud in the owner to insist upon his legal right. Silence will postpone only where silence is a fraud. *Devereux* v. *Burgwyn,* 5 Ired. Eq. 351; 2 Pomeroy's Eq. Jur. sec. 812.

Messrs. ISHAM & LINCOLN, for the appellees:

Having elected to take the purchase money, Mrs. Connelly can not repudiate the sale. *Byars* v. *Spencer,* 101 Ill. 429; *Kellogg* v. *Turpie,* 93 id. 265; *Searle* v. *Galbraith,* 73 id. 269.

Pullman had no notice of any fraud, and if he had, his knowledge as an individual would not be notice to the company when it came to buy land from him.  *Savings Bank* v. *Chase*, 72 Me. 226; *Barnes* v. *Gas Light Co.* 27 N. J. Eq. 36.

The tenancy in common, in this case, was the exact equivalent of a joint tenancy, and the death of one complaining joint tenant does not render a suit defective, because his interest survives to the others.  *Adams* v. *Dowding*, 2 Mad. 53; Story's Eq. Pl. sec. 358; Daniell's Ch. Pr. *1511.

If the death of the two complainants had been suggested, nothing would have been necessary beyond an order reciting the facts.  The irregularity, if any, could not vitiate the subsequent sale. · *Danforth* v. *Danforth*, 111 Ill. 236; *Bunker* v. *Green*, 48 id. 243; *Stoetzell* v. *Fullerton*, 44 id. 112.

As to suits by insane persons, see *Titcomb* v. *Vantyle*, 84 Ill. 371; *Searle* v. *Galbraith*, 73 id. 269; *Halfhide* v. *Robinson*, L. R. (9 Ch. App.) 373.

Messrs. LYMAN & JACKSON, also for the appellees:

The death of one of the plaintiffs did not abate the suit. Rev. Stat. chap. 1, sec. 21; *Stoetzell* v. *Fullerton*, 44 Ill. 112; *Hopkins* v. *Medley*, 97 id. 410.  See, also, *Bunker* v. *Green*, 48 id. 243; Freeman on Judgments, sec. 153, and cases cited; *Spalding* v. *Wathen*, 7 Bush, 659; *Coleman* v. *McAnulty*, 16 Mo. 173; *Camden* v. *Robertson*, 2 Scam. 508; *Hayes* v. *Shaw*, 20 Minn. 405; *Powell* v. *Washington*, 15 Ala. 803; *Reid* v. *Holmes*, 127 Mass. 326.

The same rule applies in case of the death of several of the parties.  Freeman on Executions, sec. 36; *Bowdoin* v. *Jordan*, 9 Mass. 160; *Hamilton* v. *Lyman*, id. 14; *Cushman* v. *Carpenter*, 8 Cush. 388; *Withers* v. *Harris*, 2 Ld. Raym. 808; *Howell* v. *Eldridge*, 21 Wend. 678; Story's Eq. Pl. sec. 357.

A judgment in favor of or against a lunatic is binding. Freeman on Judgments, sec. 152; *Lamprey* v. *Nudd*, 9 Fost. 299; *Wood* v. *Bayard*, 63 Pa. 320; *Foster* v. *Jones*, 23 Ga.

168; *Savings Bank* v. *Spencer*, 53 Cal. 737; *Stigers* v. *Brent*, 50 Md. 214; *Johnson* v. *Pomeroy*, 31 Ohio St. 247.

Judgments against them, it is said, are neither void nor voidable. They can not be reversed for error on account of defendant's lunacy, the proper remedy in favor of a lunatic being to apply to chancery to restrain proceedings, and to compel the plaintiff to go there for justice. *Clarke* v. *Dunham*, 4 Denio, 262; *Sternbergh* v. *Schoolcraft*, 2 Barb. 153; *Robertson* v. *Lain*, 19 Wend. 650.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

The questions arising upon the original bill are: First, did the suit for partition abate by reason of the deaths of George and Robert C. Dunn; second, was the decree of sale inoperative as against the interest of James Dunn because he was insane at the time it was rendered; third, did the sale by Bennett, of the note, and trust deed securing it, prejudice the rights of the complainants. It is clear each must receive a negative answer.

*First*—Our statute provides, (Rev. Stat. 1874, chap. 1, title, "Abatement," sec. 22): "No suit for the partition of land shall abate on account of the death of any party thereto, but it may be continued in the name of the survivors, if the interest of such deceased person survives to them." It is not proved that the deceased parties, or either of them, conveyed or contracted to convey their interest to other parties, and there is no legal presumption that they did so, in the absence of evidence. Both died intestate. Neither had ever been married, and their father and mother died before either of them, and so their only heirs-at-law were their co-complainants surviving, to whom their interest in the property, which is the subject of the suit for partition, "survived," adopting the phraseology of the statute. Apart, even, from the language of the statute, it would be difficult to assign a reason why

4—121 ILL.

the suit should abate, since all the parties in interest, and to be affected by the decree, were already before the court, and the deaths, instead of destroying the interests of the surviving complainants in the subject of litigation, only operated to change the title of those interests which had before belonged to the deceased, and vest it in the surviving complainants.

*Second*—James Dunn is described, in the bill filed herein on his behalf, as a lunatic, who sues by Simeon Straus, his next friend; and the deposition of Robert J. Speck was read in evidence, on the hearing, in which, among other things, he deposed that "James Dunn is now an inmate of the county insane asylum, at Beverley," (*i. e.*, in the county of York, England.) "He is insane. He was insane on January 1, 1880, and has been ever since that time. I believe that he was committed to such asylum by the guardians of the poor, who had found him insane." The only other evidence on the question is found in a letter from W. J. & P. Reed, solicitors, Hull, England, to Rosenthal & Pence, complainants' attorneys, dated February 16, 1880, in which they say : "We find that the persons now entitled to the property are James Dunn, (who is at present residing at the asylum at Beverley, in the county of York, but who, we understand, is at liberty to be discharged at any time,) and our client, Mr. Robert J. Speck." When this lunacy began, or what its character is, we are not informed. It may have been that the lunacy was only partial,—that is, as respected particular matters,—and that it did not affect his capacity to transact business, and, if so, it is impertinent to any question in the present case. (*Searle* v. *Galbraith*, 73 Ill. 269 ; *Titcomb* v. *Vantyle, Sr.* 84 id. 371.) We are not required to assume, from the evidence, that this lunacy existed when the suit was commenced ; but if it did, no conservator having been appointed under our statute, the suit might be prosecuted in the name of the lunatic. (*Chicago and Pacific Railroad Co.* v. *Munger*, 78 Ill. 301.) But the partition suit here, is, under our statute, an action at law.

(*Hopkins et al.* v. *Medley*, 97 Ill. 402.)   And it is well settled that a judgment at law is neither void nor voidable merely because the plaintiff is a lunatic.   Freeman on Judgments, sec. 152; *Lamprey* v. *Nudd*, 9 Foster, 299; *Wood* v. *Bayard*, 63 Pa. St. 324; *Foster* v. *Jones*, 23 Ga. 168; *Sacramento Savings Bank* v. *Spender*, 53 Cal. 737; *Stigers* v. *Brant*, 50 Md. 214; *Johnson* v. *Pomeroy*, 31 Ohio St. 247; *Robertson* v. *Lain,* 19 Wend. 650; *Clarke* v. *Dunham*, 4 Denio, 262; *Sternbergh* v. *Schoolcraft*, 2 Barb. 153; *Walker* v. *Clay*, 21 Ala. 797.

*Third*—In *Bennett* v. *Connelly*, 103 Ill. 50, we were misled by the evidence then before us, and induced to believe that the purchaser at this partition sale paid Beach $7000 to procure a release of the deed of trust, and that, but for that payment, that amount would have been paid by the purchaser to the commissioner, in addition to the other sum paid by him, as the purchase price of the property; and hence that it was, in fact, so much purchase money, and, as such, entitled to be distributed to all the parties in interest.   The evidence in this record shows, beyond all doubt, that that view was erroneous.   Beach did not receive any money from anybody.   In truth, he only held the note and deed of trust for Pullman, and Pullman did not receive any money from any source because of his ownership of the note and deed of trust, nor was the amount bid for him, at the sale, reduced or abated by reason of his ownership of the note and deed of trust.

The facts are, briefly, after the suit for partition was commenced, on the 11th of September, 1873, the Connellys executed their promissory note to Kretzinger & Johnson for $6000, payable one year after date, with interest at the rate of ten per cent per annum, and to secure the payment of this note they executed a deed of trust upon the premises in controversy, to Paul Cornell, trustee.   The deed of trust was, therefore, necessarily limited to and binding only upon the interest of the Connellys in the premises, and after the

·decree for sale, it followed their interest in the proceeds, and affected it only.    It was no incumbrance upon the interest of the complainants in the original bill, and could in nowise adversely affect that interest.    (*Loomis* v. *Riley*, 24 Ill. 307.) That note, and, with it, the trust deed, passed by assignment to John I. Bennett; and on the 20th of January, 1880, Bowen, as agent of Pullman, either paid off the note or purchased it, and the deed of trust, paying Bennett, at the time, as the consideration, $7000.    It is impossible that this could have injured the complainants, since it had no reference to their interest in the premises.    Assume that the trust deed was a nullity, this payment took nothing from them to which they were entitled, and it added no burthen to their property. Assume it was valid, it bound only the interest of the Connellys in the proceeds of the sale, and the question of whether Bennett should hold or transfer it, could, by no possibility, affect any one but himself and the purchaser.    Bowen, as the agent of Pullman, simply placed the note and deed of trust in the hands of Beach, another agent of Pullman, who held them at the time of the sale of the property.

The evidence is ample that the sale of the property, after the re-appraisement, was not against the wishes of the complainants in the original bill, but that, on the contrary, it was, if not entirely brought about, certainly encouraged by the attorneys of these complainants, and they afterwards insisted, in court, upon the confirmation of the sale.    The evidence, moreover, fails to show that the amount for which the property was sold was less than it would have been had not the deed of trust been executed, or apparently subsisting as a lien at the time of the sale.

Coming now to the questions arising upon the cross-bill, and waiving all question of the right to file a cross-bill in the state of facts set up, we are of the opinion that the ruling below was right, for several reasons.

*First*—The evidence is insufficient to sustain the allegation that Bowen bribed Bennett to procure a re-appraisement of the premises, and decree therein directing their sale. As has been stated, the note and deed of trust were obtained from Bennett by Bowen, and Bowen is dead. The only person living who knows what the contract between them was, is Bennett, and he denies the charge. He positively asserts that negotiations between Bowen and himself, in regard to the note and mortgage, did not occur until after the decree was entered appointing commissioners to re-appraise the premises, and he denies that the decree was entered pursuant to any previous understanding between himself and Bowen. Pullman denies that he ever authorized Bowen to employ Bennett to procure the entry of a decree for the re-appraisement of the premises, and a sale pursuant thereto. But complainants claim that the charge is proved by the circumstances detailed by Bennett in his evidence. He says that Bowen did not buy the note and deed of trust of him, but simply paid $7000 for the satisfaction of the note and the release of the deed of trust, subject to the right of Bennett to have him hold them as unsatisfied until Bennett could effect an arrangement with the Connellys for the payment of reasonable attorneys' fees, Bennett meanwhile holding a release of the deed of trust, which he would place on record if Bowen attempted to collect the note. And it is argued, that since the deed of trust (being executed *pendente lite*) was only a lien on the interest of the Connellys in the proceeds of the sale, and was no incumbrance to the title which would pass to the purchaser at the sale, and could, hence, be no impediment to the sale, Pullman got nothing for the $7000; that the sum was not intended as a gift to Bennett, and must, therefore, have been paid to bribe him to procure the re-appraisement and sale thereunder of the premises. Pullman testified that Bowen's authority was limited simply to purchasing the note and deed of trust; that he was, himself,

informed of the existence of the deed of trust, and that there was a controversy between the Connellys and the holder of it, and he was advised by his legal counsel to buy it; and the claim that Bowen did buy the note and deed of trust has strong support in the facts, clearly established; that the note and deed of trust passed into Bowen's hands uncanceled, and without any indorsement or accompanying writing evidencing an agreement that they were, conditionally or otherwise, to be canceled. Of course, it is not claimed that if Bowen, in fact, did purchase the note and deed of trust, there is, under the circumstances, anything unreasonable or unusual in the transaction.

But assuming, as perhaps, under the evidence, we must, that Bennett's memory is not at fault, still, inasmuch as his evidence clearly shows that Bowen thought that the trust deed incumbered the land (not the mere interest of the Connellys in the proceeds of the sale) so that the purchaser must purchase subject to the lien, and other evidence also shows that Pullman was making purchases of land in that vicinity for the purpose of building up large manufacturing establishments, and that the ownership and possession of this land was desired as being necessary to that end, and Bowen was informed that the Connellys would contest the validity of the deed of trust, and, he supposed, thereby delay, materially, the sale of the land, there is nothing so improbable as to excite disbelief that he might have thought it promotive of Pullman's interests to pay $7000 to, in the language of Bennett, "remove the deed of trust as a bone of contention," and an impediment to the sale. The delay of the sale, for any length of time, might have put it out of his power to carry out his scheme, and have worked loss many times greater than $7000. It is true, this desire of and necessity for a speedy sale might have impelled to the employment of Bennett to forward the sale, if that had been possible; but where two motives,—one lawful and the other unlawful,—are

presented, we are to assume, in the absence of satisfactory evidence to the contrary, that the lawful motive controlled.

If Bennett's evidence shall be accepted as conclusively establishing that Bowen did not buy the note and deed of trust for Pullman, why shall it not also be accepted as conclusively showing that the money was paid by Bowen for the purpose of removing the deed of trust as an impediment to the sale, under the erroneous opinion that it was, in truth, an impediment? It is not apparent why he should have desired to speak falsely in one respect more than in the other, and his opportunity of knowing is the same in both respects. Undoubtedly it was expected, when the $7000 was paid, that the property would be advertised for sale at an early day. But there were reasons why those controlling the matter should have desired that, and it would not, therefore, have seemed necessary to have incurred great expense to that end. An offer had been made, by another agent of Pullman, to bid for the land, if it should be offered for sale, at least $125 per acre. This was then thought to be a price justifying its sale. The taxes on the land had not been paid pending the litigation, and there had been sales for the delinquent taxes, and it was feared that titles might be acquired in this way, with the aid of the limitation laws, that would defeat the title of the parties concerned in the partition suit. In any event, it was realized the unpaid taxes, accumulating by delay, with attendant interests, penalties and costs, were becoming a serious burden to the premises. Bennett had advanced considerable sums of money in payment of costs and expenses of litigation, and he was needing his money. Payment, also, of the petitioner's attorney's fees had been deferred until money should be realized from the sale of the premises, so that the attorneys on all sides were anxious for an early sale, and professedly acted to that end.

The evidence, moreover, fails to establish that Pullman, or his agent, Bowen, knew that Bennett was acting contrary to

instructions of his clients, or that he agreed that he would act disregarding their wishes, and it expressly shows that, in truth, Bennett did not control the sale. Bennett, after the order of sale was made, requested the commissioners to advertise the property. This was on or about the 3d of February. After that, Bennett did nothing. The Connellys, some time in January, employed Young & Hannay to prevent the sale and to get the trust deed canceled. They notified Bennett of their employment, in January, and although they did not have a formal order entered of record substituting themselves as attorneys for the Connellys, in the partition suit, until the 8th of March, they, in fact, acted as such attorneys after the 3d of February, and Bennett ceased to act after that date. On the 11th of February they applied to the attorneys representing the Dunns and Speck, in the partition suit, and requested them to consent to postpone the sale, but those attorneys declined to accede to the request. No one representing Pullman prevented compliance with that request, and no act of Bennett stood in the way. Young & Hannay, as the attorneys of the Connellys, thereafter prepared a bill of review of the partition case, praying therein that the sale be enjoined, and on the 17th of February the attorneys of the Dunns and Speck appeared in court, and resisted the filing of that bill and the enjoining of the sale, and the court, although allowing the bill for review to be filed, refused to enjoin the sale. Bennett was not present, and he did nothing to then prevent the sale being enjoined.

Again, if the Connellys were injured by the sale being made when it was made, they should have interposed that objection to a confirmation of the commissioner's report. It will be seen, by reference to the statement preceding this opinion, that they filed seven objections to the confirmation of the commissioner's report of sale, neither of which is that the re-appraisement and sale thereon were procured by the bribery of their attorney, nor that the sale was made at an

improper time. The hearing of the exceptions was continued until the 13th of April. At no time did the Connellys ask leave to add an exception that the re-appraisement and the sale thereon were procured by the bribery of their attorney, or that the sale was made at an improper time, and yet, at that time, the evidence is clear that the Connellys and their attorneys had been informed of all that they now know in regard to the sale of the note and deed of trust by Bennett to Bowen. This is a judicial sale. (Freeman on Co-tenancy and Partition, sec. 548.)   And the rule is, that the order of confirmation is conclusive as to all matters upon which the court might have been called upon to pass, had the parties chosen to have brought them forward as objections to the confirmation. Freeman on Void Judicial Sales, sec. 44. See, also, authorities cited in note three.

*Second*—It is urged that by reason of the Connelly's ignorance of the facts that Bennett had received $7000 in satisfaction of the note, and that he held a release of the trust deed, they were induced to make a compromise, and consent to abandon the right to sue out a writ of error and prosecute an appeal, which, but for such ignorance, they would not have done.   This, in our opinion, admits of two answers: First, they then knew, or ought to have known, of everything in this respect that they now know; second, if the note and trust deed were illegal, or were subject to any defences, the Connellys always knew it.   When Bowen obtained them, the note was several years past due, and Beach obtained them still later, and so they were, in the hands of Bowen or Beach, subject to any and every defence that they were in the hands of Bennett.   The transfers of the note and trust deed, therefore, in nowise changed or affected the question of the liability of the Connellys, or its exten.`   In no possible way could they be injured by that transfer.   Young & Hannay, as their attorneys, about the 17th of February, 1880, filed a bill in their behalf, against Kretzinger & Johnson and Ben-

nett, praying that the deed of trust be canceled. Subse-quently, after the sale and before its confirmation, Beach served a notice upon the Connellys that he held the note and deed of trust, and that he would move the court for an order directing the commissioner to pay the amount of the note out of the proceeds of the sale coming to them, and they, there-upon, made Beach a defendant to the bill to cancel the deed of trust. Now, if they were entitled to have the deed of trust canceled when it was in the hands of Bennett, no reason has been suggested, and none has occurred to us, why they were not entitled to have it canceled on this bill. So, too, if, as against Bennett, the Connellys were entitled to set up a par-tial defence to the note, it would seem clear that they were entitled to set it up as against Beach, for he simply stood in the shoes of Bennett.

No reason is disclosed by the evidence for claiming that anything that belonged to the Connellys passed in the trans-action between Bowen and Bennett. The money was that of Pullman, and its payment imposed no liability on the Connellys to reimburse him because of the payment; and the note and trust deed, whether valid or invalid, worthless or valuable, were, in no sense, their property. If, however, the note and trust deed were valid and binding upon the Con-nellys for the payment of all or a part of the sum expressed in the note, and Bennett intended, by the transaction with Bowen, to make a gift to them, he might impose his own restrictions, and require, as he claims he did in his contract with Bowen, that the release of the deed of trust should not be placed upon record until his reasonable attorney's fees were arranged.

In neither view, therefore, is there any ground for say-ing the Connellys were deprived of any legal rights because knowledge of the transaction between Bowen and Bennett was withheld from them. It may be that Pullman, through the ignorance of his agents, paid Bennett $7000 which he would

not have paid but for that ignorance; but this does not injure the Connellys. The evidence clearly shows that the sale was open to the competition of all, that an unusual number of persons were present and participated in the bidding, and that the bid of Pullman's agent, upon which the property was knocked off, was the highest, and that it was fairly made. Some persons had heard rumors that Pullman was intending to establish a large manufacturing establishment in the vicinity of this property, and that he therefore desired it, and were thereby induced to make bids they otherwise would not have made. The proof is made that the price paid for the property is much beyond what it would have brought, but for the contemplated improvements by Pullman. It is conceded that Pullman was authorized to act through agents, if he chose to do so, and that he was under no obligation to disclose to the public the character and extent of the improvements he was designing to make, before he made his purchases of property; and it must be conceded, upon like principle, to be likewise true that the fact that he would pay a much larger sum for the property, if it were necessary to secure it, than the amount he bid, is unimportant, if the sale was, in other respects, fairly conducted, and he was the highest bidder.

There is no ground for holding that the deed of trust affected the bidding. One witness, it is true, (J. H. Scott,) testified that "if the trust deed had been cleared off and released and settled," he would have bid more than he did; but he does not say that he would have bid more than the premises were sold for. No other witness testifies that he has knowledge of any other bidder being affected by the trust deed in his bidding. There is no reason, as we have seen, why the failure to revive the partition suit, after the deaths of George and Robert C. Dunn, or the insanity of James Dunn, should have affected the bidding, and there is no proof that, in fact, they did.

*Third*—The decree of confirmation was renderd on the 13th of April, 1880, and the Connellys, soon after, accepted the money due them on the basis of that decree. They lived where they witnessed, daily, or could witness, the uses to which the property was put after the purchase, and improvements placed upon it, and they have continued to live there. The present bill was not filed until the 15th of August, 1883, and the cross-bill was filed later. Between July 1, 1880, and the filing of the bill, expenditures had been made for improvements upon this property, amounting to $677,491. These included foundry, (commenced to be built June, 1881,) roundhouse, (commenced to be built in April, 1881,) and railroad tracks and other improvements, commenced in 1880. In September, 1880, to a suit brought by Bennett, against Mrs. Connelly, for attorney's fees, she pleaded as a set-off, the $7000 paid by Bowen to Bennett, as so much money received by him as purchase money for the property, and she was allowed the amount, after deducting therefrom attorney's fees, by the judgment of the court. The case was appealed, first, to the Appellate Court, and finally to this court, where the judgment was reversed; but the litigation was pending until after the filing of the present cross-bill. We are inclined to think, under the circumstances, that, even if it had been competent for the Connellys to have had the sale set aside, if application had been promptly made for that purpose, they were guilty of such *laches* as should alone now prevent it. *Hoyt et al.* v. *Pawtucket Inst. for Savings,* 110 Ill. 390; *Clapp et al. Exrs.* v. *Peterson,* 104 id. 26.

The decree is affirmed.

*Decree affirmed.*